GARRETT, Judge.
We affirm appellant’s convictions and sentences, but write to respond to the issues addressed by the dissent. First, the “one state witness” was a police officer who erroneously testified about a question he asked appellant. On direct examination that officer testified:
Q. What if anything did [appellant] say regarding why he was down in South Florida on April 4th, 1990?
[[Image here]]
*1203 A. The question that was asked, what are you doing — so what are you doing down here in Florida. To that he responded, I knew we were down here for a drug deal, but I didn’t know it was cocaine.
On cross examination the officer testified:
Q. And you testified on direct that the question that was asked was, what are you doing here in Florida, isn’t that correct?
A. It was either that or what were you doing down here. What are you doing down here? What are you doing down here? I might have said Florida.
Defense counsel later started to ask questions about the contents of the officer’s police report. In response to the state’s objection, defense counsel argued he should be able to show that report indicated that what the officer had actually asked appellant was, “Did you know why Fruetel was coming to the room with $31,-000,” not “What are you doing down” or words to that effect. The trial court sustained the objection, but allowed impeachment of the officer. Defense counsel then proceeded as follows:
Q. Okay. And isn’t it true that the question was posed — that was posed to him to which you testified he responded had nothing at all to do with why [appellant] came down to Florida?
A. After reading my report and remembering how my report was written and everything which was done right after the situation, that’s correct?
Appellant said he knew “we were down here for a drug deal” not “coming down to get drugs” as stated by the dissent. Regardless of what question was asked, the answer incriminated appellant and was relevant to counter his lack-of-knowledge defense.
Second, although defense counsel had the state redact the statement “my partner up there” from the tape of the drug transaction, the statement did not necessarily refer to appellant as Ms. Fruetel’s “partner.” The dissent draws that inference as did defense counsel.
Third, as to the excised statement of Ms. Fruetel’s that appellant was not involved in the drug deal, the tape contained other such statements which were not redacted and Ms. Fruetel gave trial testimony to that effect. Also, defense counsel could have asked Ms. Fruetel whether she made that statement and asked an officer the same thing and whether the unedited tape contained the deleted statement. However, defense counsel chose not to pursue those lines of questioning.
Fourth, as to the prosecutor’s comment during closing argument that appellant was the “money man,” the trial judge remarked that he “allow[ed] wide latitude on closing argument.” Breedlove v. State, 413 So.2d 1, 8 (Fla.1982), holds that “[w]ide latitude is permitted in arguing to a jury.” Breedlove also holds that due deference should be given to a trial judge’s discretionary rulings as to the propriety of the state’s closing argument and that a prosecutor may make legitimate argument based on logically drawn inferences. Id. Contrary to the dissent’s observation, the state did establish how a routine drug deal occurs. One of the surveillance officers gave the following testimony when explaining the significance of the $5,000 found in appellant’s pants pocket:
Q. In your experience as an undercover detective involved in drug trafficking investigations, have you had occasion to ever notice whether or not people are looking to purchase drugs might bring more money than they’re supposed to, to a drug transaction?
* * * * * *
A. Yes, sir. Frequently in conducting operations the traffickers or in fact when we’re on the other side of the coin we also bring extra money to the deal due to the fact that the deal somewhat fluctuates in the amount of money you’re negotiating for the product whether it be cocaine or marijuana.
*1204 Q. So in your experience you’ve seen drug traffickers bring extra money due to the fact that the negotiations of the a drug deal change.
A. Yes, sir. They change quite frequently usually right up to the time of the actual transaction.
Lastly, the evidence against appellant was overwhelming. He chartered the plane that flew Ms. Fruetel and him from Virginia to Florida. He lied when he said the reason for the flight was to pick up a government contract. He paid for two motel rooms, one for himself and Ms. Fruetel and the other for the pilot. In Ms. Frue-tel’s company, appellant directed the pilot to drive to various locations in South Florida to contact “one of the partners” because “they needed one more signature” before they “could go home,” At another motel, appellant got out of the car, walked to the trunk of the car, and watched as Ms. Fruetel put $31,000 from the trunk into an “overnight bag.” Just before Ms. Fruetel left with the bag to go inside the motel to transact the drug deal, appellant told her to “take care of — pick up the paperwork and let’s go home.” He then waited in the parking lot as the “money man” and also acted as a “lookout.” After the police arrested appellant he told the pilot that he was sorry.[1]
AFFIRMED.
GLICKSTEIN, C.J., concurs.
WARNER, J., dissents with opinion.

. We note that appellant's defense counsel stated when he objected to a portion of the state's closing argument, “I have not raised any entrapment, Judge.”